Good morning, and may it please the Court. My name is Peter Cohen, and I represent the five appellants who were defendants in the District Court action in this case, and who asked the Court to reverse the District Court's finding of no bad faith in the plaintiff's filing in pursuit of Counts 1, 2, and 3 of the First Amendment complaint, and to find that the District Court abused its discretion by ignoring three sets of admissions made by the plaintiff and its counsel in the District Court. The first, by ignoring the admissions that the plaintiff made during the course of discovery, that the trade secrets that formed the heart of Counts 1 and 2 of the First Amendment complaint had never existed in the first place, and thus no misappropriation was ever possible from the get-go, facts that plaintiff and its counsel had to have known before they filed suit. Second, by ignoring the admission made by the plaintiff's CEO during the course of the deposition that I this opportunity, another fact he must have known at the outset of the case, before he asserted Count 3 against the appellants for tortiously interfering with that opportunity. And third, by ignoring the admission made by the plaintiff's CEO and its counsel that it wasn't until January of 2018, nine months after the original complaint had been filed, six months after the First Amendment complaint had been filed, and after motions practice and discovery that was very costly to the defendants, that the company and its counsel had not investigated whether the so-called trade secrets that formed the basis of Counts 1 and 2 ever existed in the first place. Admissions that there was no factual basis to these claims at the outset, and admissions that the plaintiff and its counsel engaged in no due diligence exercise to determine the factual basis of its claims, 1, 2, and 3. We went to great pains in our briefing to set forth the allegations that were made both in the original complaint and in the First Amendment complaint with respect to the existence of these so-called trade secrets. Were those the trade secrets that you highlighted, were those the entire universe of trade secrets that the plaintiff alleged your client had misappropriated? It was the entire universe of all the major trade secrets. What does that mean, major? There were some very minor documents, business-related documents, that the plaintiff also alleged were trade secrets, and the evidence showed that there was, that they were not trade secrets from the get-go. The main portion of Counts 1 and 2, the trade secret counts, were these five software prototypes that the complaint and the First Amendment complaint described in vivid detail with fancy names. We got into discovery and basically asked the plaintiff, show us, where are the trade secrets? Who developed them? Show us the documents and show us examples of these software prototypes. In our responses to our interrogatories, our requests for admissions, our document requests, the response back during the course of discovery is that none of these software prototypes exist with respect to the business-related documents. Those were never fully developed? They were never created. The trade secrets that the plaintiff alleged the defendant had misappropriated through improper means, causing damage to the plaintiff, never were created. Well, the reason I ask that is that I recall that there's evidence in the record of the company actually presenting on at least one of these so-called trade secrets, EHMP software, where they made presentations at least suggesting that they were working toward development of the software. And I guess one could argue, well, you know, maybe this thing never came to fruition, but we had something in the works, and that by itself might be enough to warrant protection. Well, the trade secret statute is very concise about its definition, and we asked the plaintiff with respect to that very software prototype, as well as the other four that were alleged to have been misappropriated, to show us evidence of their existence. We were told in interrogatories and requests for admissions, they admitted that they do not exist. So we have a situation here where the plaintiff has asserted that the defendant's misappropriated trade secrets through improper means causing damage to the plaintiff that never existed. And our argument to the court is that that is something that the plaintiff and its counsel had to have known. And this wasn't limited just to count one and two. It was also count three, alleging that the defendants had tortiously interfered with a business opportunity with the plaintiff. I deposed the CEO of the company who had knowledge about all of these matters, and he identified it as the 2016 BAA. And I asked him, were you aware of the opportunity? He said yes. I asked him, did you have the opportunity for your company to submit a bid? He said yes. And he testified under oath during his deposition that he consciously decided. He was aware of the opportunity. He could have assigned personnel to submit a proposal in response to the opportunity, but he consciously chose not to respond to it. If you read the original complaint and the First Amendment complaint, that's not what that says. What it accused the defendants of was you hid this opportunity from us, and because you hid it, we were unaware of it, we didn't have an opportunity to respond to it. Had we known we would have responded to it, and had we responded to it, we would have won the bid. The CEO of the company admitted, I was aware of the bid, I chose not to respond to it, and I'm the one responsible. Why the company did not respond to that business opportunity. These are facts that a plaintiff has to have known in his head before he asserted count three, accusing the defendants of tortiously interfering with that business opportunity. But by the time we found that out, we had to go through a couple of months of motions practice, we had to go through four to four and a half months of costly discovery, and we find out in January and February of 2018, the CEO's testimony that he was completely aware of this business opportunity, and he deliberately chose not to respond to it. You know, of course, the district court, in a very general order, came to a different conclusion. I guess one of the concerns that I have in this case is whether or not it would be appropriate simply to send it back to the district court to make more specific findings with respect to these issues that you pointed out, or whether we have enough on this record to decide it ourselves. The latter, and I know that has come up often. I sat through the prior oral argument today, and this issue has come up before. The record is replete with the plaintiff's admissions. We laid it out in painstaking detail, and deliberately so, in our opening brief, in our reply brief, specifically citing the interrogatory responses, the RFAs, the response to document requests, and the CEO's deposition testimony. The record is clear that at the get-go of this case, they were aware that the trade secrets did not exist, and, you know, a lot of this is seen through the eyes of bad faith in what an objectively reasonable litigant and attorney would do. Well, we would suggest to the court that an objectively reasonable plaintiff and its counsel, knowing what they knew before they filed the original complaint and the First Amendment complaint, knowing that the trade secrets don't exist, knowing that the company itself was responsible for not pursuing that business opportunity, that no objectively reasonable litigant or attorney would have pursued these claims. I'm sorry, weren't there also documentary reports that were part of the trade secret claim? There were several. The two major ones was these total contract reports, and another one called past performance write-ups. Those were the two major business documents related. First of all, there's an issue about even if those documents existed, whether they would be trade secrets, but they don't exist. But I thought, and the record is complicated, but I thought that sort of the individual components exist, that they were not, in fact, stand-alone reports, but that the That was a post hoc rationale that the CEO of the company gave during the deposition. Before that deposition, we served discovery requests upon the plaintiff asking, show us examples of the total contract value report. Show us examples of the past performance write-ups. The response is back, and we detail this in our briefs, none. They do not exist. Then during his deposition, he said, oh, no, the total contract reports, that's really part of this other report called the pipeline report. First of all, it's not, number one, and number two, we already asked them to produce. The way they pled it was that the total contract reports and the past performance write-ups were independent documents. They stood on their own. So we asked them, produce them to us. They don't exist. Can I just, this sounds a teeny bit like a discovery dispute, and then in the end, it turns out your clients win on the merits, but that does not, it doesn't, it doesn't obviously suggest that the claim was brought in bad faith. This is not a case, and we cited this in our, in our reply brief. This is not a case where plaintiff loses, defendant wins, and therefore defendant seeks attorney's fees. That's not this case. We know the law on that subject. You can't seek attorney's fees under those circumstances. No, I understand that. I'm just saying that what you just described, like did they call the report the right thing, the wrong thing during discovery? It sounds like a kind of a garden variety discovery dispute followed by the fact that plaintiff couldn't really make their case after discovery, and therefore plaintiff loses. It doesn't In the pleadings, the plaintiff alleged, take the two business documents that we're talking about. The plaintiff alleged very specifically that those were trade secrets that the defendants misappropriated through improper means causing damage to the plaintiff, okay? These weren't just any documents. They were trade secrets supposedly misappropriated. We get into discovery and we say, show us. Where are these documents? And there would have been nothing for the plaintiff to discover from the defendants. It was their trade secrets. They would know whether or not they were trade secrets. Absolutely, from the get-go of the case. It doesn't make any sense that a plaintiff would proceed with a misappropriation of a trade secret claim if you know from the get-go that they don't exist. And this gets to the standard of bad faith that the district court did not appreciate. It's what would an objectively reasonable litigant and its attorney have done, knowing what the true facts are. There might be some issue as to whether or not misappropriation occurred, but I guess your point is the plaintiff is in the best position to know whether or not these trade secrets ever existed, and they admitted that they never did. Correct. And the plaintiff and its counsel are uniquely situated, not the defendant. We're the receivers of the allegations. We're the ones who are obligated to take discovery of these allegations. But certainly a plaintiff and its counsel ought to know whether or not the documents and the software prototypes that you're alleging to be trade secrets that you're accusing the defendants of misappropriating exist. And according to Mr. Shiplet's affidavit that he submitted to the district court in January of 2018, he acknowledged that he and his client did not engage in any analysis of whether or not these trade secrets existed, and that was only in response to our discovery requests. And that was nine months after the allegations were made in the First Amendment complaint. We brought all of these admissions, the ones that we documented to the court in our opening and reply briefs, to the district court's attention three times. In our motion for summary judgment, in our opposition to the plaintiff's motion to dismiss the entire case on the verge of an adverse summary judgment ruling, and in our motion for fees, in our brief in support of our motion for fees, we carefully documented these three sets of admissions to the district court, and the district court could care less. And what we would beseech this court is that in order to engage in an analysis of whether true bad faith occurred, the question ultimately is what an objectively reasonable litigant and attorney would do knowing what these plaintiffs subjectively knew, what this plaintiff and attorney knew subjectively at the outset of the case. The district court in this case, in its order on attorney's fees at page two, sort of latched on to a contention that it claims you made, that is that Acura Labs never existed. And it cited to this interrogatory response, and it said, well, look at here, these guys are completely out to lunch, case closed. What about that? Well, we cited to the district court what is in the record as page 2020 to 21 and 2007. This was the plaintiff's response to interrogatory five. We said, show us what Acura Labs is all about, because Acura Labs appears all over the pleadings. The response back was, is that Acura Labs was nothing more than a concept. It had no organizational structure, and it created no software prototypes. Hence our representation to the district court that there was no such thing as Acura Labs. But even if existed, they admitted that there were no software prototypes ever created, and that was at the heart of their trade secret claims. So the question is, is how, if you're a plaintiff and you're about to file a lawsuit, and you're about to accuse the defendant, you misappropriated my trade secrets, it seems to me that the plaintiff ought to know whether or not they exist. And its lawyers should know that too. And we have the lawyer on record here admitting in the district court that he didn't even ask his client until January of 2018. By that time, my clients expended hundreds of thousands of dollars of fees. I'm sorry, does that concession that you're citing, does that apply to the documents too, or just to the prototypes? I believe it was to the prototypes. But the documents are still floating out there, right? Let me ask you this question. If it turned out, forget the prototypes, they never had any prototypes, but they did have documents, and they called them the wrong thing, because they were not standalone reports, they were individual documents. Isn't that enough to sort of save the claim? The two main documents were these two that I identified before. They admitted in their discovery responses, not that they existed, but that they did not exist. Not under that title, but then, and you say he tried to backfill it as part of his deposition, but it's one discovery process. Other parts of discovery indicated that the documents did exist, just not as standalone reports, right? We would disagree with that, that the section of the pipeline reports that the CEO referenced post hoc is not the document that was pledged in the complaint, and that the defendants were accused of misappropriating. I should also mention, well, my time is out. I reserve the, I believe, five minutes. All right. Thank you, Your Honor. Good morning, and may it please the Court. My name is Chris Shiplett, representing Acura Technologies, the appellee in this matter. I think I'd like to dive directly into some factual issues that appear to be concerning the Court. I'd like to answer a question that Judge Harris asked, as well as a couple questions that Judge Diaz asked, because I think those questions all run together. Judge Harris's question was whether, if the reports, these business reports, were simply misnamed, right, or if they were called two reports in the complaint, but in fact they were one report, would that still be sufficient to survive, or would that still be sufficient to find no bad faith in filing the complaint? I think the answer is yes, because really— But who should find that? Why shouldn't the District Court do that? It seemed like the District Court's order in this case was short on the facts, and long on its irritation with the parties and the discovery process. So why don't we send it back to the District Court to make those very findings that you suggest should be made in this case? So let's start with that, and then I would like to move back to kind of these facts, but let's talk about the idea of remand. There were five bases for finding bad faith. Under the Defend Trade Secrets Act, under the Virginia Uniform Trade Secrets Act, on the claim of tortious interference, which is a common law claim, Rule 11, 28 U.S.C. 1927, and the Court's inherent power, I apologize, six. Under five of those six, the District Court's error is not just harmless error if it applied the wrong standard, thus mitigating remand, but it was—well, let me back up. The District Court's error on five of those is clearly harmless error. What error? I thought Judge Diaz was asking about whether we should remand so that the District Court can take an actual hard look at the facts in this case. I apologize. Sure. You should remand if the District Court erred, right? And so then there's two different pieces of whether the District Court erred, and I was talking about whether the District Court erred in applying the clear and convincing legal standard, but it appears you were talking about whether the District Court erred—or your question was about whether the District Court— I was talking about the merits. The merits and the facts. The facts in front of the District Court were voluminous, and the question for facts is whether there was clear error in the decision. And the question before this Court is whether the District Court's decision was plausible on the facts in front of it. And the District Court clearly considered both the appellant's submissions as well as the appellee's voluminous submissions at the record 1739 to 1988. And so, given the amount of record in front of the District Court, I think it's clear that the District Court could have plausibly, because it did, find no bad faith. Indeed, the District Court found not only no bad faith, but the District Court found that Akira acted in good faith. But what's—I mean, I just wonder if you could respond to the factual issues in this case, because your brief doesn't. Your brief sort of makes the point, like, look, this is a very generous and deferential standard of review, clear error. It makes the procedural point you're making now. The District Court had the benefit of this voluminous record. But nowhere, either in your brief or the District Court's order, can I find, really, a response to the arguments on the facts that your colleague is making. Yes, Your Honor. On the facts, Akira pled nine independent sets of facts that it called trade secrets. Those were the—what we'll call the EHMP semantic layer integration software, the EHMP business rules software, plans for software called the patient cohort software, a piece of software to take different sections of proposals and put them all together, a sales document called the pipeline report, a sales document called the total contract value report, prior saved proposals that Akira would use to help it in generating new proposals, a sales document called past performance write-ups, and other sales presentations. Now, to the District Court, Akira presented the following evidence. First, it presented evidence that Akira Labs existed and that the appellants knew it existed during the entire—the entirety of the litigation, because the appellants were the workers who worked in Akira Labs. In fact, they were, other than one other worker, the only people who worked in Akira Labs. You can find that at JA 1739 to 1988. That's actually the entire submission, but quite a bit of it talks about Akira Labs. Evidence that this semantic layer integration software was software, that it was developed, but that it wasn't a prototype within the technical concept of what a prototype is, that evidence was presented in 1739 to 1749 and 1879 to 1979. And in particular, Joint Appendix 1905, which I think Judge Diaz, you referred to where this was software that was being developed to present and there was a presentation on this software. And I want to make note, and it's within this part of the record, I want to make note that the employees responsible for developing the software were two of the defendants, Mr. Phipps and Mr. Michalczak. Mr. Chenomiraja, the owner of the company, was not responsible for developing the software. In one case, the software was developed on one of the defendant's laptops. So moving on, the patient cohort software, the appellants have alleged that it was bad faith because this was not a software prototype that was developed. But the appellee never claimed that this was software that was developed. The appellee claimed that this was plans for software. You can find that at JA 1725. And finally, the proposal section software, JA 1980 to JA 1988. And then the business software, the appellant didn't really reference that that software didn't exist. Perhaps, and certainly the appellee lost the case or withdrew the case, perhaps that the business documents were not ultimately protectable as trade secrets, but that wasn't known at the outset of the litigation. So factually- So in light of those facts, how do we square the admissions that Mr. Cohen seems to rely on with laser-like focus to show that you and, I don't know about you, but the attorney and your client acted in bad faith? It was me, it was me, Your Honor. And there's two ways to square that. The first one is that those don't cover all of the alleged trade secrets. So you have software prototypes that potentially are no longer trade secrets, but you also have a bunch of other trade secrets or documents that are still deemed to be trade secrets and still have evidentiary support that they are trade secrets all the way up until the end of the litigation. The second point I want to make, and this is a distinction we made very clearly in our opposition to the motion for attorney's fees, and our arguments are at 1721 to 1737, and that is that the admissions were that the software prototypes did not exist. Now I recognize that the things that were claimed to be software, excuse me, the things that were claimed to be trade secrets in the complaint were called software prototypes. But first off, the admission was a response to a request for interrogatories that said that these prototypes were never created. But again, the software itself was created, and that's found, again, in the submission in opposition to the motion for attorney's fees, that the software was created. Is that just incorrect, inaccurate, a misstatement by your client? Yes. But not an actionable misstatement such that there was a bad faith basis for bringing the client. I'm sorry, which was the misstatement? That these software pieces, this EHMP, semantic layer integration, was a quote-unquote prototype. And that's from the complaint? That's from the complaint. Okay, so the complaint was the misstatement. Yes. What about the tortious interference claim? As I understood Mr. Cohen's argument, there was an allegation in the complaint that this opportunity was diverted, was not revealed to your client, and that's the basis for the claim. And in fact, your client admitted that he had full knowledge of the claim or the opportunity and just declined to proceed on it. There were multiple bases for this. There are two answers to that. Number one, there were multiple bases for the tortious interference claim as well. And in the first amended complaint in paragraphs 41, 97, 101, and exhibits 10, 11, and 12, you find that at Joint Appendix 352, 360, and 423 to 443, there's a second piece of the tortious interference claim, and that is that Mr. Phipps is speaking during the entire time, well, prior to the litigation and as it turns out during the litigation, to Akira's representative, government representative at the FDA. And Akira has contracts at the FDA. One of the potential contracts is this ORA BITS contract, but another potential contract is the contract that Akira has during the litigation that's called, excuse me, it's the ORA BITS contract is the one they have. The FDA BAA is the one that they allege. Now Akira wrote a line in the complaint, you know, that says that, that the defendant is denied other potential opportunities to compete with the government or to, to submit contracts to the government. Now I recognize that's a vague line, but that line did survive a fully briefed motion to dismiss. And that was the basis of the claim that Mr. Phipps was speaking with Ms. Kolemowork from his, from his personal account to Ms. Kolemowork's personal account. It was only after issuing a subpoena to Ms. Kolemowork and receiving from her emails between her and Mr. Phipps that it was determined that although they were speaking, they weren't speaking about things that potentially could have interfered with Akira's retention of this ORA BITS contract. So that had two separate, two separate factual bases. I want to point out a sort of a legal issue here, and that is that the appellants kind of sweep everything under this bad faith, right? But tortious interference is a common law claim. There's no statutory basis for a finding of bad faith. So in order to find bad faith on tortious interference, this court would have to look to another basis for it, either Rule 11, 28 U.S.C. 1927, or the district court's inherent power. So the idea that bad faith as it applies to the Defend Trade Secrets Act or the Virginia Uniform Trade Secrets Act is the same as bad faith as it might apply to the tortious interference claim is incorrect. Can I ask you a question about this? Because this is the other thing that I found troubling about the district court order and also, I guess, about most of the briefing. I mean, I think you started by saying there were six potential bases for fees in this case. Yes. And the district court never breaks them down as to what standard would be required under each, whether the burden of proof is clear and convincing or preponderance, whether it's object of bad faith, subject of bad faith. I mean, there's just no discussion of, everyone treats this, as you say, as like a unitary question, but it's not. There's all these different statutory provisions, non-statutory sources of fees. I mean, I guess we could go first and try to break them down, all six, and figure out what the standards are. It's not really brief. The district court hasn't addressed it. Isn't that another reason to take a look at the actual sources of fees in this case and figure out what the standard is? Well, Your Honor, I think other than the Defend Trade Secrets Act standard, which I don't think a court in this circuit has considered, we at least briefed all of each of the other standards. And in our briefing, we argued that the court's application of one standard or another, or even lumping it all together, as you say, although we did not specifically argue this, is harmless error. I know you said it's harmless error, but it's not like, and I'm not faulting the briefing. The district court wasn't focused on this, but I didn't see like an actual, under the federal statute, I do remember the argument, but under the other sources of authority, like I looked into the Virginia statute and it was really confusing whether that's clear or convincing or preponderance of the evidence. And I just, I am concerned that the district court hasn't focused on this and that we ourselves have precious little to go on in trying to figure out what the standard is under each one of these sources. There's also this objective versus subjective good faith that no one has really addressed. I think to answer your question, remand potentially might make sense under the DTSA, but I think it's more clear under the Virginia Uniform Trade Secrets Act, the tortious interference claim, and the Rule 11, 1927, and inherent power claims, because each of those claims fail even if there was bad faith. The Rule 11 claim fails because it was improperly made for a multitude of reasons. It was, you know, part of another motion. There was no safe harbor. It was after the litigation was over. There's no opportunity to withdraw the pleading. The 1927 motion was improperly made because it sought to seek punishment for the filing of the complaint. 1927 is for punishing unreasonable and vexatious extension of the litigation. And the inherent power motion was improper because that really requires evidence of some sort of a fraud on the court even more than 1927. So in answer to your question, Your Honor, what I'm saying is that potentially for the DTSA claim, it might make sense to clarify the standard, although again, there has been no standard promulgated in this court, although there has been in other federal courts, although we didn't brief that. But for those other claims, it doesn't make sense. What about the state trade secrets claim? What's the standard for that? The state trade secrets claim, according to the Trident case, is bad faith has to be found by clear and convincing evidence. So in that case, as it applies to the state, Judge O'Grady applied the correct standard. The only thing they have left hinges on bad faith, right? And the court found there was no bad faith. Is that correct? Yes, Chief Judge Geiger. Right. Yeah. Everyone, for example, the rule 11, they didn't comply with the notice, as you said. So they're left with bad faith. And district court did make an error in terms of saying it was clear, convincing as opposed to preponderance. But if he found, and which he did, that there was no objective good faith was the basis for the count, right? And they found no evidence of bad faith. Yes, Chief Judge Geiger. And that I think will be my final point, unless there are other questions. It's not that the district court considered the evidence and said, well, there's not enough evidence to determine bad faith. The district court considered the evidence, included the interrogatories that the appellant has called admissions, all of the evidence, including directly that. And on that record found not only was there no bad faith, but there was good faith. A finding that's inherently kind of incompatible with a finding of bad faith under any standard at all from... Summary judgment was denied. Summary judgment was... In a case like this, I don't see how it'd be hard to find bad faith when you denied summary judgment. Well, Chief Judge Geiger, I want to be clear on that. Summary judgment was denied as moot because the motion for leave to amend to dismiss the three claims was granted. But that was another case where, in dicta, in a footnote, but the district court judge found that there was no evidence of bad faith. If there are no more questions. Thank you, Your Honors. It is true that the district court found that there was no evidence of bad faith, and that's why we appealed this decision. The only... What we had suggested in our briefs is that the only way to objectively arrive at that conclusion is to put on blinders and not look at the material admissions that the plaintiff made in this case. This court in the Wooden decision, we briefed it in our papers, said that in making a determination of bad faith, the court did in that case, it was a pedophile case, is that it looked to see what admissions were made by the plaintiff at the time that allegations were made and evidence was brought in. And that is what we're asking the court to do here. The admissions made by the plaintiff that the trade secrets did not exist from the get-go, the fact that there could objectively have been no tortious interference with a business opportunity that the company was well aware of and deliberately declined to pursue. Do you have a response to your colleague's point that the complaint also alleged, it wasn't just that one time, but that the complaint alleged somewhat generally that there were other times where there were interferences? No. We do take issue with that. The only concrete opportunity that was identified was this 2016 BAA, a broad agency announcement opportunity. There was no other obligations. Counsel mentioned this Orbit contract. There was never, this was an existing contract that the company had. There was never any allegations that the plaintiff, that the defendants tortiously interfered with that existing contract. The case, the count three- They're sort of in a tight spot on this one, aren't they? Before they get discovery, like here's what they know. They have a contract with the FDA. They get all their business from the FDA. It turns out a bunch of their employees have secretly started a company and are also in They're talking to the FDA. That's our main client. They're doing it on the sly. We think they're interfering with our business opportunities and then see what you get in discovery. The only opportunity, well, I guess the shotgun approach is one way to look at it. My concern is that we have Title VII plaintiffs, pro se plaintiffs. They come in here all the time with general but plausible complaints and we don't want to say, you don't even get to go to discovery. But here's the difference, and this goes back to your honest earlier question. The plaintiffs here, unlike, I do a lot of Title VII work, unlike a plaintiff in a Title VII case, all the evidence is in the employer's possession. Well, but is it on this, I understand your point about trade secrets, but I don't see why that's true when it comes to tortious interference. How do they know what their employees are secretly doing when they go talk to the FDA? The only opportunity that was at issue was this 2016 BAA. It was the only thing they pled. No, no, they didn't. They also pled, I can't remember, I don't have it in front of me, but there was this sort of general language. It was not concrete, but they said this one and also other business opportunities. There was no factual basis for any of that. The 2016 BAA was the only concrete opportunity. And that's how it turned out. But I guess what they alleged was they, at the time, likely were denied the opportunity to compete for other work is how they described it. And there was no factual basis for any of that. Well, isn't it enough that a bunch of their employees have started a secret company and are going to meet with their number one client? That seems plausible. What else are they doing there? What was ultimately the focus of discovery for four months, including by the plaintiff, was this one opportunity, the 2016 BAA, which the CEO acknowledged he was aware of, could have submitted a bid and consciously chose not to. It was the only thing discussed in discovery. So the fact that that's the only thing discussed in discovery, does that mean that that's the only thing they would have at trial? That's for you to follow with summary judgment, say that's all you have at this point, and you move forward. But you're saying it's because their focus was this in discovery. That means that's all they had. That's kind of incongruent, isn't it, with litigation? No one likes to be sued and spend money, but the American rule is that everybody pays their own lawyer unless you can show that there's some extraordinary situation and here's bad faith. And the court, looking at it, and much more intimately involved than we are, said there is no bad faith. If the court had said something like this, well, it seems like one hand this might be bad faith, this may not be, then the standard as clear versus preponderance would be relevant because you said, well, you didn't balance them right. Found none, none at all. And I know it's frustrating for you, obviously, as a defense counsel, but it seems to be, Judge Harris was asking the question about plausible, no one likes their former employees to be in the negotiating or having relationships with their main client, main client and customer and looking at these things. And also, does it have to be a prototype developed in order to have a trade secret? The whole process could be trade secret, even though it never came to fruition. Is that correct? It's possible, but that's not what the defendants were accused of doing. They were accused of misappropriating software prototypes. We get into discovery and find thousands of dollars later that they don't exist. And the plaintiff is uniquely in a position to know from the get-go before you file a complaint as to whether those two major business documents exist. It just seems, I would suggest that that's just a reasonable proposition. Before you start accusing people of misappropriating trade secrets, you want to check to see whether or not they exist. And counsel admitted that he didn't check until five or six months after the First Amendment complaint was filed. Does that mean that it's automatically bad faith because you didn't? Maybe it was not careful lawyering. Is that the same thing as bad faith? The question of bad faith is what would an objectively reasonable litigant do, knowing what this plaintiff knew from the outset? The judge looked at it and said it wasn't bad faith. The only way... The judge is closer to it than we are. We're sitting here in Richmond. The judge issued a page and a half opinion. It did not engage in the legal analysis of the various grounds upon which the defendants sought fees, and it put blinders on respectfully. We documented all the admissions. Deliberately refused to look at evidence that was there? That what you said? Well, the best I can say is that in the district court's decision, it was not addressed. Oh, that's different what you said. I mean, but in terms of what a reasonable lawyer would have done, it does seem like what a reasonable lawyer would have done maybe, or a more careful lawyer, is go back and edit the complaint so that where it says prototype, it refers to software. But like, is that really enough for a finding of bad faith? They had a chance to edit the complaint when they filed the first amended complaint. No, I know they did. I'm speaking hypothetically. It seems like your complaint is that... I shouldn't say complaint. Your contention is that what they did wrong was refer to prototype, when what they meant was software, not yet at the prototype stage. But so what? Like, that doesn't... It doesn't make the claim go away. It doesn't mean nobody did anything wrong. It just means they should have been more careful in the way they framed their complaint, even on your... Seems to... Our argument is that before you accuse the defendants of misappropriating software prototypes, and that was the accusation in two different pleadings, there ought to be the plaintiff, and I'm a plaintiff's lawyer, a plaintiff ought to diligently look to see whether or not that's factually correct. See whether or not that's the right way to describe the thing that was okay. They admitted it does not, and it stands to reason that the defendants were accused of something that didn't exist and had to spend a lot of money to unearth something that the plaintiff and its lawyer had to have known from the outset. Thank you very much. Thank you, counsel. We'll ask the clerk to adjourn the court for the day, and we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Albert Diaz, Pamela A. Harris